# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OHIO

In Re:                                          )
                                                )        **JUDGE RICHARD L. SPEER**
Robert/Sherrie Haar                             )
                                                )        Case No. 06-31270
    Debtor(s)                          )
                                                )

### DECISION AND ORDER

    This cause comes before the Court after a Hearing on the Debtor's Objection to the Motion of the United States Trustee to Dismiss Case Pursuant to 11 U.S.C. § 707(b)(2) and (b)(3). At the Hearing, it was stipulated that, prior to proceeding with the various issues raised in this action, a preliminary legal question should first be decided: Whether the Debtors are permitted to include in their 'means test' calculation of § 707(b)(2), payments made on secured property that will not ultimately be retained? The Debtors urge this Court to allow such payments, with the impetus of the Motion of the United States Trustee to Dismiss being based upon the opposite conclusion; that under the 'means test,' a debtor may only deduct payments being made on collateral that will be retained.

    At the conclusion of the Hearing, the Court, in consideration that any decision rendered on this question will potentially effect many other cases, took the matter under advisement so as to afford time to fully consider the matter. The Court has now had this opportunity and finds that the Debtors may include, in their 'means test' calculation, payments made on secured property, notwithstanding that they will possess neither the property nor make payments on the secured debt on a postpetition basis. Beginning with the background circumstances, both legal and factual, giving rise to this controversy, the reasons for this decision are now explained.

## BACKGROUND

On October 17, 2005, the Bankruptcy Abuse Prevention and Consumer Protection Act, otherwise known as BAPCPA, became effective. A large part of the Act was enacted in response to what was seen as a deficiency in the bankruptcy process – that individuals with income available to pay their creditors were using Chapter 7 to fully escape paying their obligations. To address this issue, Congress made substantial changes to § 707(b) whose sole function, when first added to the Code in 1984, was to provide a mechanism by which a bankruptcy court could deny Chapter 7 relief to an undeserving individual with consumer debt. *In re Marshalek*, 158 B.R. 704, 709 (Bankr. N.D.Ohio 1993).

Prior to BAPCPA, § 707(b) provided that a debtor's bankruptcy case could be dismissed if the court found that the granting of relief would be a "substantial abuse." By way of BAPCPA, however, Congress heightened this standard by dropping the adjective "substantial." 11 U.S.C. § 707(b)(1). Congress also eliminated in BAPCPA what had otherwise been a safeguard for the debtor: under the former § 707(b), there existed a presumption in favor of allowing the debtor's case to proceed.

In now providing that a debtor's Chapter 7 case may be dismissed for just "abuse," as opposed to "substantial abuse," § 707(b) sets forth two methods by which a court is to make such a determination. First, § 707(b)(2) sets forth a formulaic approach whereby a debtor's ability to repay his or her debts is gauged. If then, under this test, an ability to pay threshold is met, the statute provides that "the court shall presume abuse exists." 11 U.S.C. § 707(b)(2)(A). Although this

Page 2

presumption may be rebutted, § 707(b) goes on to set this bar extremely high, placing it effectively off limits for most debtors. 11 U.S.C. § 707(b)(2)(B).[1]

Even in the absence of any presumption of abuse arising under § 707(b)(2), the following paragraph, § 707(b)(3), provides that a court may still dismiss a case based upon the particular circumstances of the case. This basis for dismissal is completely independent from § 707(b)(2); thus simply because no presumption arises according to the 'means test,' does not insulate a debtor from a finding of abuse. In determining whether a dismissal for abuse is proper under § 707(b)(3), the court is required to consider "whether the debtor filed the petition in bad faith" or whether "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse."

In this matter, the Motion of the United States Trustee (hereinafter the "UST") to Dismiss is brought under both these grounds. However, the limited question now before the Court – the effect, if any, that may be accorded to a debtor's payments on secured property which will not be retained – involves only the application of § 707(b)(2), and its mechanical formula for determining when its presumption of abuse arises. For purposes of this limited issue, the Parties do not dispute these basic facts.

On May 31, 2006, the Debtors filed a petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code. At the time they filed their bankruptcy petition, the Debtors had two adult children, both of whom, because of a disability, were claimed as dependents. In the bankruptcy schedules accompanying their petition, the Debtors disclosed the existence of $312,206.00 in secured

---

[1] To rebut a presumption of abuse which arises under § 707(b)(2)(A), this section provides: "In any proceeding brought under this subsection, the presumption of abuse may only be rebutted by demonstrating special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative."

Page 3

claims and $49,451.00 in unsecured claims. For their secured claims, the Debtors set forth that the majority of the debt, $284,000.00 in all, encumbered their residence which the Debtors valued at $220,000.00. With respect to their residence, the Debtors filed with their petition a 'statement of intention' wherein they disclosed their intent to surrender their residence. (Doc. No. 1).

The formulaic approach provided in § 707(b)(2) is commonly referred to as the 'means test.' As its name suggests, the function of this test is to determine whether a debtor has the means available to repay his or her obligations. The actual mechanics of the test are highly detailed and rigid, consisting of 755 words in just subparagraph (b)(2)(A) alone – which does not take into account terms and other matters incorporated therein by reference. Yet, the overall concept of the test is simple; if a debtor's income exceeds his or her necessary expenses by certain predetermined thresholds, a presumption that the debtor is abusing the bankruptcy process will arise. When the presumption arises, it is known as failing the 'means test,' with the converse naturally being true: if the presumption of abuse does not arise, the debtor will be deemed to have passed the 'means test.'

When performing the 'means test' calculation of § 707(b)(2), income is calculated by reference to the debtor's "current monthly income." This is commonly referred to as a debtor's CMI. With some limited exclusions, "current monthly income" (hereinafter "CMI") is defined to include the debtor's average monthly income received from all sources, including that of a nonfiling spouse, for the six calendar months prior to the filing of the bankruptcy case. 11 U.S.C. § 101(10A). A safe harbor provision is then applied so that only a debtor with a CMI above the applicable state median income for a family of that same size may be placed in jeopardy for a finding of presumed abuse under § 707(b)(2). 11 U.S.C. § 707(b)(7).

For this first step of the 'means test,' the figures ultimately put forth by the Debtors show a gross monthly income of $6,759.50. (Doc. No. 35). When extrapolated over a full calender year, this amounts to an annual salary of $81,114.00, above Ohio's median income which at the time the

Page 4

Debtors filed their petition was $65,126.00 for a family of four.[2] As it concerns its Motion to Dismiss, the UST did not take issue with the Debtors' gross income figure.

For those, such as the Debtors, having a CMI above the applicable state median, the 'means test' then requires a calculation as to the amount of that income which may be devoted to the repayment of the debtor's obligations. A presumption of abuse will then arise if this calculation reveals that, over the course of 60 months, the debtor has the ability to pay (1) $10,000.00, constituting $167.67 per month; or (2) over the course of 60 months, the debtor has the ability to pay $6,000.00 to $10,000.00, constituting $100.00 to $166.67 per month, and such an amount will pay at least 25% of the debtor's nonpriority, unsecured claims. 11 U.S.C. § 707(b)(2)(A)(i)(I)/(II). To obtain this repayment figure, the debtor's CMI is then reduced by those categories of expenses allowed under § 707(b)(2)(A) which in most instances may not be increased, notwithstanding that such expense figures do not reflect the debtor's actual expenditures.

The types of expenses a debtor is permitted to deduct from his or her CMI under the 'means test' fall into five overall categories: (1) expenses as outlined in the IRS' National Standards, *e.g.,* food, clothing, household supplies, personal care, and miscellaneous expenses; (2) expenses as outlined in the IRS' Local Standards, which include housing and transportation; (3) actual expenses for items the IRS categorizes as "Other Necessary Expenses," including such items as taxes, mandatory payroll deductions, health care, and telecommunication services; (4) actual expenses, with limitations, for certain other expenses specified by the Bankruptcy Code; and (5) payments on secured and priority debts. *In re Harris*, 353 B.R. 304, 307 (Bankr. E.D.Okl. 2006). For these allowable expenses, the Debtors put forth monthly payments aggregating $10,686.49. Accordingly, when set against their monthly income of $6,759.50, the Debtors take the position that they pass the

---

[2]

*See* Census Bureau Median Family Income By Family Size available at www.usdoj.gov/ust/eo/bapcpa/20060213/meanstesting.htm.

'means test' because their available monthly income, being in the negative by almost $4,000.00, necessarily falls under the repayment thresholds of § 707(b)(2)(A)(i)(I)/(II), *supra*.

As it regards their 'means test' calculation, the UST did not take material issue with those figures deducted by the Debtor from their CMI in accordance with the first four categories of allowable expenses just listed above. The dispute between the Parties, instead, centered on the fifth category of expenses – that for secured debts – allowed under the 'means test.' In particular, based upon their intent not to retain the property, the UST contests the permissibility of the Debtors deducting from their CMI two expenses totaling $4,733.34, representing those payments made by the Debtors to service the first and second mortgages encumbering their residence. According then to the calculation of the UST, when this figure is eliminated as a deductible expense in the 'means test' equation, the Debtors, instead of $10,686.49, have only $5,953.15 in allowable monthly expenses. And when deducted from their CMI of $6,759.50, this leaves the Debtors at least $806.35 per month to pay their unsecured creditors, well in excess of the $167.67 presumption of abuse threshold set forth in § 707(b)(2)(A)(i)(II).

## DISCUSSION

Before this Court is the Motion of the UST to Dismiss pursuant to 11 U.S.C. § 707(b)(1). As a determination of dismissal under this section directly involves the ability of a debtor to receive a discharge and directly affects the creditor-debtor relationship, this matter is a core proceeding over which this Court has the jurisdictional authority to enter final orders. 28 U.S.C. §§ 157(b)(2)(J)/(O); 1334.

When calculating if, in accordance with the statute's presumption of abuse thresholds, a debtor has income available to repay their obligations, it is provided in § 707(b)(2)(A)(iii) that a

Page 6

debtor may deduct from their CMI, payments made on account of secured debts. For this provision, the issue before the Court is whether this deduction's permissibility is dependent upon the Debtors retaining their secured property. The starting point for this analysis necessarily begins with the statutory language of § 707(b)(2)(A)(iii). *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985) ("[t]he starting point in every case involving construction of a statute is the language itself.")

Section § 707(b)(2)(A)(iii) provides:

(iii) The debtor's average monthly payments on account of secured debts shall be calculated as the sum of–

(I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and

(II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts[.]

Since its implementation with BAPCPA in October of 2005, no less than eleven cases have addressed this provision's application as it relates to the issue raised by the UST regarding the retention of secured property.[3] While there exists no unanimity among these cases as to outcome,

---

[3]

Those cases not factoring in the issue of the debtor's retention of collateral: *In re Walker*, 2006 WL 1314125 (Bankr. N.D.Ga. May 1, 2006); *In re Hartwick*, 352 B.R. 867 (Bankr. D.Minn. 2006); *In re Simmons*, — B.R. — , 2006 WL 3782959 (Bankr. N.D.Ohio 2006); *In re Randle*, — B.R. — , 2006 WL 3734351 (Bankr. N.D.Ill. 2006); *In re Singletary*, 354 B.R. 455, 468 (Bankr. S.D.Tex.2006); *In re Nockerts*, — B.R. — , 2006 WL 3689465 (Bankr. E.D.Wis. 2006); *In re Zak*, — B.R. — , 2007 WL 143065 (Bankr.N.D.Ohio 2007); *In re Sorrell*, — B.R. — , 2007 WL 211276 (Bankr. S.D.Ohio 2007). Those cases taking the opposite view: *In re Skaggs*,

they all have at some level what this Court views as the proper jumping off point. That the issue of whether a debtor, under the 'means test,' must retain property in order to claim it as a deduction against CMI is dependent on the meaning of this language contained in subclause (I) of § 707(b)(2)(A)(iii): "amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition . . . "

For this interpretation, the UST advocates a forward looking approach so that it is the ultimate disposition of the secured property which is determinative. Under this approach, if, at any time during the bankruptcy process, the debtor is dispossessed of his or her collateral, – whether voluntarily or involuntarily, or whether occurring prepetition or postpetition – the secured obligation cannot be deducted from the debtor's CMI. (Doc. No. 37). The Debtors, by comparison, urge that the phrase "amounts scheduled as contractually due" be construed to mean a snapshot of their financial conditions at the time they filed bankruptcy. (Doc. No. 34). Resultantly, the Debtors argue that the mere fact that they stated an intent to surrender their secured property should not prevent them from expensing that property against their CMI.

When a debtor files for bankruptcy relief, a number of significant legal events occur – *e.g.*, an estate is created, a trustee is appointed to administer the estate, and it triggers the automatic stay. *In re Doser*, 412 F.3d 1056, 1062 (9th Cir.2005). Although the operation of these events may suspend the operation of the contract, none of these events actually void the contract. To the contrary, the Bankruptcy Code assumes that a debtor's contractual rights and duties will continue. For example, the Bankruptcy Code provide that executory contracts may be assumed after the petition is filed. 11 U.S.C. § 365. A debtor is rather only relieved of his or her contractual obligations when a discharge

---

349 B.R. 594, 599-600 (Bankr. E.D.Mo.2006); *In re Harris*, 353 B.R. 304 (Bankr. E.D.Okla. 2006). *See also In re Singletary*, 354 B.R. 455, 468 (interpreting scheduled to refer to the petition, but finding that the date of the filing of the motion to dismiss, not the petition, is relevant in the means test analysis).

Page 8

is entered, and then only to the extent that the debt underlying the contractual obligation is dischargeable. 11 U.S.C. § 524(a).

From this, it then becomes but a short step to reach this logical conclusion: a debtor's surrender of collateral, either before or after a bankruptcy petition is filed, has no effect on whether, under § 707(b)(2)(A)(iii)(I), payments are "contractually due" to secured creditors following the petition date. With the possible exception of nonrecourse loans,[4] at the time the bankruptcy petition is filed, a debtor's rights and duties under an otherwise enforceable prepetition contract remain, notwithstanding the collateral's surrender. Resultantly, a reading of just the term "contractually due" does not support the forward looking position espoused by the UST. So long as the Debtors were contractually obligated to make payments in some or all of the 60 months subsequent to the time they filed their bankruptcy petition, such payments may be deemed to be "contractually due" for purposes of § 707(b)(2)(A)(iii)(I).

In isolation, this interpretation of the term "contractually due" has not been problematic; those other courts which have addressed this term generally agree that a debtor's surrender of collateral does not negate the debtor's continuing obligation under the contract. *See In re Singletary*, 354 B.R. 455, 468 (Bankr. S.D.Tex.2006). A primary question, however, that has arisen, and one for which there exists a split of authority, is whether the language immediately precedent, "scheduled as" is to be accorded its dictionary meaning; or whether this term is to be defined by reference to its

---

[4]

The term "nonrecourse" has been defined as the "status of a person who holds an instrument which gives him no legal right against prior endorsers or the drawer to compel payment if the instrument is dishonored." Black's Law Dictionary (5th Edition 1979). Thus, the term "nonrecourse" means that the lienor may look only to the property that is subject to his lien to satisfy his debt and cannot look to the debtor personally for payment. *In re Hixson Chevrolet Co.*, 20 Bankr. 108, 110 (Bankr. N.D. Tex. 1982).

Page 9

common bankruptcy usage so that a debtor's schedules and statements form the basis from which the Court should determine whether a debt is "scheduled as contractually due." *In re Walker*, 2006 WL 1314125 *3 (Bankr. N.D.Ga. May 1, 2006); *In re Skaggs*, 349 B.R. 594, 599-600 (Bankr. E.D.Mo.2006).

Generally speaking, when a dictionary interpretation is applied, it has been concluded that the debtor's subsequent disposition of collateral is not relevant in the 'means test' analysis. The reason: the ordinary meaning of "scheduled" is "to plan for a certain date."*In re Walker*, 2006 WL 1314125. By comparison, when "scheduled" is afforded its common usage in bankruptcy, deducting from the debtor's CMI payments made on secured property that will be surrendered has not been permitted. *In re Skaggs*, 349 B.R. at 599; *In re Harris*, 353 B.R. 304, 309 (Bankr. E.D.Okl.2006). The UST, in its arguments to the Court, strongly advocated for this latter interpretation. (Doc. No. 37, at pgs. 5-7).

On these disparate interpretations, the Court would tend to agree with the UST's view that the word "scheduled" should be accorded its common usage in bankruptcy – i.e., representing those written materials which are required to accompany a debtor's petition. The word "scheduled" has unique connotations within the confines of the bankruptcy process, thus making it reasonable to give the word its ordinary usage in bankruptcy. 2A Sutherland Statutory Construction § 47:29 (6th ed.). Yet, it does follow that such an interpretation requires excluding from the 'means test' calculation, payments made on collateral which will not be retained.

The language "scheduled as" does not stand independently, acting instead only to qualify whether an obligation is "contractually due." Thus, the position advocated by the UST only follows if scheduling a debt in a petition somehow operates, *carte blanche*, to negate that an otherwise "contractually due" obligation is no longer. This seems unlikely; as explained earlier, an obligation may continue to be "contractually due" notwithstanding the filing of a bankruptcy petition.

Page 10

Consequently, as a debtor is required to disclose in their petition all debts, there is no reason to suppose that simply scheduling a debt in a petition would then operate so as to negate this rule of bankruptcy law. Simply put, one does not lead to the other: a debt may continue to be "contractually due" at that time a petition is filed, even though it is scheduled in the debtor's bankruptcy petition.

To be sure, words in a statute are not to be read so as to render them superfluous. Hence, the elementary rule of statutory construction that, wherever possible, effect must be given to every word of a statute. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992). However, this aid in interpretation is easily reconciled without, as the position of the UST requires, reading "scheduled as" as providing an independent basis to disallow deducting from a debtor's CMI payments made on secured property that will not be retained.

For certain categories of debts, secured obligations included, the holder of the debt has no present and vested claim against the debtor. For example, a debtor is required to list obligations for which he or she is a codebtor, but so long as the primary obligor has not defaulted, the debtor has no contractual duty to make payments on the debt at the time the petition is filed. This would also be the case with debts which are scheduled as disputed, contingent, or unliquidated.

Consequently, in some limited circumstances, scheduling a debt in a petition will denote that the obligation is not "contractually due," thereby giving effect to the term "scheduled as"in the statute. Conceptually this makes sense. A debtor should not be able to take a deduction under the 'means test' on an contingent obligation, such as that arising when a debtor co-signs on a loan for a child, which is not presently due and may never become due. However, this is a far cry from the position advocated by the UST: that scheduling a debt in a petition means that the obligation is, for all purposes, no longer "contractually due" within the meaning of § 707(b)(2)(A)(iii)(I).

Page 11

Resultantly, whether the word "scheduled" is read according to its dictionary meaning or in conformity with its common bankruptcy usage is really a distinction without a difference. Under either interpretation, the antecedent language "scheduled as" does not alone modify the term "contractually due" in such a way so as to prevent a debtor from utilizing in the 'means test' equation payments being made on collateral that will ultimately be surrendered. *In re Randle*, — B.R. — , 2006 WL 3734351 *4 (Bankr. N.D.Ill. 2006).

But in addition to the antecedent language, "scheduled as," the term "contractually due" in § 707(b)(2)(A)(iii)(I) is also modified by this subsequent language: "in each month of the 60 months following the date of the petition[.]" And in honing in on the word "following," the UST points to this language as additional support for its position that § 707(b)(2)(A)(iii)(I) compels a forward-looking approach. The Court, however, disagrees with such a broad interpretation.

The clause, "in each month of the 60 months following the date of the petition," is a subordinate clause, coming after this ensuing language in upper clause (iii) of § 707(b)(2)(A): the "debtor's average monthly payments on account of secured debts shall be calculated . . ." Thus, when placed in this context, the 60-month constraint of § 707(b)(2)(A)(iii)(I), far from reaching the broad stroke painted by the UST, simply operates to define the period over which the debtor's "contractually due" payments are averaged. *See In re Singletary*, 354 B.R. at 470 ("the phrase 'in each month of the 60 months following the date of the petition' is to limit the maximum allowable deduction to the average over the five year post-petition period. The payments must only be 'scheduled as contractually due' during any portion of the 60 months, but they do not need to be actually paid.").

In *In re Walker*, the court provided this illustration:

> the debtor may have a car loan with a remaining payment term of only two years, or a mortgage with a remaining payment term of twenty years. The debtor would include only the remaining twenty-four months of the car loan payments, but would add all sixty months of the mortgage payments in order to calculate the average monthly payment on secured debts.

2006 WL 1314125 *3. This is self-intuitive. In performing calculations under the 'means test,' a debtor should not be able to take a full deduction for a payment that would have terminated, in the near future, under its own terms.

Completing now the picture, the Court, for all the reasons just explained, cannot read § 707(b)(2)(A)(iii) so as to prohibit a debtor from deducting from their CMI, payments that are contractually due on collateral at the time the debtor's bankruptcy petition is filed, notwithstanding that the collateral will not ultimately be retained. Such a reading conforms to the general tenet in bankruptcy that circumstances are to be gauged from the petition date, with the Bankruptcy Code replete with examples where any deviation therefrom is made explicit. *See e.g.*, 11 U.S.C. § 541(a)(5) (allowing a limited class of postpetition interests in property acquired by the debtor to become property of the estate); 11 U.S.C. § 503 (allowing an administrative expense against the estate for certain services that are performed postpetition).

In this way, nothing in the overall statutory structure of § 707(b) even remotely indicates that, in examining a debtor's deduction for secured debt under the 'means test,' a snapshot approach is not appropriate. To the contrary, even the introductory provision of § 707(b) utilizes the filing date as its starting point, providing, in relevant part, that a court "may dismiss a case *filed* . . . if it finds that the granting of relief would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1) (emphasis added). Under § 301(a), a case is "commenced by the *filing* with the bankruptcy court of a petition . . . ." (emphasis added). Additionally, this conclusion does not, contrary to the position of the UST, contravene Congress' intent in enacting the test.

Page 13

The 'mean test,' – although enacted as a device to ensure that debtors with an ability to pay their debts, would actually do so – is a strict mechanical test. *In re Randle*, — B.R. — , 2006 WL 3734351 *3. Its function, in essence, is to limit the court's discretion. *In re Gress*, 344 B.R. 919, 922 (Bankr. W.D.Mo. 2006). ("In enacting the means test, Congress intended to take away discretion from the courts as to higher income debtors, who were seen as abusers of the system."). But what the position of the UST seeks to do is throw a wrench into this mechanical process by advocating that a special class of payments, that for secured debts, be ascertained by reference to *actual* future events while most others are not, being frozen in place at the time the petition is filed – *e.g.*, those expenses allowed under the IRS National Standard, Local Standards and Other Necessary Expenses.

In turn, this has the potential to create a morass of entangled situations, each requiring a case-by-case analysis, thereby defeating the very purpose of having a mechanical test. For example, what to do with the debtor that states an intention to surrender property, but then is able to negotiate a reaffirmation agreement with the creditor. *In re Simmons*, — B.R. — , 2006 WL 3782959 *4. Similarly, what to do in the opposite situation where a creditor states an intent to reaffirm a secured debt, but then, for whatever reason, is unable to follow through with his or her stated intention. Query: for what duration of time must the actions of the debtor be monitored?

Taking this a step further, the Debtors point out that a reaffirmation agreement may be rescinded well after a discharge is entered by simply providing notice to the secured creditor. 11 U.S.C. § 524(c)(4). No reason is required. Thus, a debtor wanting to surrender property, but also wanting to deduct payments on that property from his or her CMI, could frustrate the UST's efforts by simply entering into a reaffirmation agreement and then rescinding that agreement after the discharge had been entered.

Page 14

Surely, given all this, had Congress wanted the result advocated by the UST, it would have made its intentions clear. As recently explained by another court in this district addressing this same issue:

> Had Congress intended in § 707(b)(2)(A)(iii)(I) to limit which secured debts could be deducted from a debtor's "current monthly income" it could have qualified the language used as it did in subsection (II) of that same statutory provision which permits the deduction of "additional payments due to secured creditors" only if such payments are for certain collateral that is "necessary for the support of the debtor and the debtor's dependents." See § 707(b)(2)(A)(iii)(II).

*In re Simmons*, — B.R. — , 2006 WL 3782959 *3 (Bankr. N.D.Ohio 2006).

It also cannot be ignored that passing the 'means test' does entirely insulate a debtor from the effects of retaining or surrendering property and a later finding of abuse. Section 707(b)(3), as explained earlier, provides an independent basis for a court to dismiss a case for abuse. Thus, a debtor who surrenders sufficient property so as to enable them to appreciably pay their unsecured creditors could, in appropriate circumstances, still be subject to action to dismiss under § 707(b)(3). The opposite is just as true. A debtor who seeks to reaffirm on a high amount of secured debt, especially luxury items, could still be subject to an action to dismiss under § 707(b)(3). *See In re Griffieth*, 209 B.R. 823, 831 (Bankr. N.D.N.Y.1996) (debtor's stated intent to reaffirm may constitute further indicia of an absence of good faith in a § 707(b) analysis).

One final note before concluding. The UST argues that to ignore a debtor's surrender of collateral for purposes of the 'means test' calculation, interferes with its statutory duties under § 704(b)(1). (Doc. No. 37, at pgs. 8-9). This section, in relevant part, provides:

> (b)(1) With respect to a debtor who is an individual in a case under this chapter–

Page 15

> (A) the United States trustee (or the bankruptcy administrator, if any)
> shall review all materials filed by the debtor and, not later than 10
> days after the date of the first meeting of creditors, file with the court
> a statement as to whether the debtor's case would be presumed to be
> an abuse under section 707(b)[.]

But to equate the duty of the UST to review all the materials filed by a debtor under this section with the issue now before the Court attempts to cross a chasm for which there is absolutely no support.

At the very least, § 704(b)(1) specifies nothing even remotely in line with the position of the UST. *In re Randle*, — B.R. —, 2006 WL 3734351 *5. Moreover, at its core, the duty to "review" the materials filed by a debtor simply connotes that the accuracy of such materials may be questioned by the UST. *See Webster's II New Riverside University Dictionary* 1007 (1984) (defining "review" as to "examine with an eye to correction or criticism"). But what these materials ultimately mean with respect to dismissing a case for abuse under § 707(b) is ultimately a matter for the Court to decide. It stands to reason then that the duties imposed upon the UST by § 704(b)(1) can be fully accomplished without resorting to its interpretation of § 707(b)(2)(A)(iii).

In summation, the Court cannot find that a debtor, who surrenders secured property, is prohibited from expensing payments on that property against their CMI. In this particular case, therefore, the Debtors, notwithstanding their intent to surrender their collateral, are entitled in their 'means test' calculation to deduct from their CMI two expenses totaling $4,733.34, representing those payments made by the Debtors to service the first and second mortgages encumbering their residence. And as this calculation shows that no presumption of abuse arises under § 707(b)(2), the Motion of the UST to dismiss under this section must be denied.

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Decision.

Page 16

In re Robert and Sherrie Haar
Case No. 06-31270


Accordingly, it is

**ORDERED** that the Motion of the United States Trustee to Dismiss pursuant to 11 U.S.C. § 707(b)(2), be, and is hereby, DENIED.

*IT IS FURTHER ORDERED* that within 10 days, commencing from the entry of this Order, the United States Trustee report to the Court whether it wishes to pursue its action to Dismiss under 11 U.S.C. § 707(b)(3).

Dated: February 20, 2007

Richard L. Speer
United States
Bankruptcy Judge

Page 17

# CERTIFICATE OF SERVICE

Copies were mailed this 20th day of February, 2007, to the following parties:

Sherrie H. & Robert W. Haar
1834 N Wynn Rd
Oregon, OH 43616

Patricia A Kovacs
500 Madison Ave
#525
Toledo, OH 43604

Elizabeth A Vaughan
1709 Spielbusch Ave.
#107
Toledo, OH 43604

Gilbert B Weisman
c/o Becket & Lee
PO Box 3001
16 General Warren Blvd
Malvern, PA 19355

Holly N. Wolf
PO Box 165028
Columbus, OH 43216-5028

Office of the U.S. Trustee
c/o Maria D. Giannirakis
U.S. Courthouse
201 Superior Ave, East
#441
Cleveland, OH 44114


/s/ Robert C.W. Birmingham
Deputy Clerk, U.S. Bankruptcy Court

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OHIO

In Re )    **HONORABLE RICHARD L. SPEER**
)
)
Stephen Zuccarell )
)
**Debtor(s)** )    **Case No. 07-30026**
)
)
)

## CERTIFICATE OF SERVICE

This is to certify that a copy of the attachment to the Decision and Order was sent by ordinary mail this 9th day of July 2007 to the following parties:

Thomas D. Richards
Richards & Associates
3322 Erie Avenue, Suite 101
Cincinnati, OH 45208

United States Trustee
Howard M. Metzenbaum U. S. Courthouse
201 Superior Avenue, East
Suite 441
Cleveland, OH 44114

Linda M. Battisti ust21
Office of the US Trustee
201 Superior Avenue
#441
Cleveland, OH 44114

Louis J Yoppolo
1200 Edison Plaza
300 Madison Ave
Toledo, OH 43604-1556

Thomas E Cafferty
1600 Fifth Third Center
608 Madison Avenue
Toledo, OH 43604

Stephen M Zuccarell
2352 Old Stone Ct., #8
Toledo, OH 43614

Dated:   7/9/07

_____ /s/Dawn M. Serna-Gensch _____

Deputy Clerk, U.S. Bankruptcy Court

-